UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GRATUITY SOLUTIONS, LLC, and    Fort Myers, Florida
GRATUITY, LLC,

Case No. 2:24-cv-00737-JLB-NPM

     Plaintiffs,

Wednesday, September 4, 2024

-vs-

1:35 p.m. - 2:29 p.m.

TOAST, INC.,

(Via Zoom)

     Defendant.
_____

**TRANSCRIPT OF MOTION HEARING**
BEFORE THE HONORABLE JOHN L. BADALAMENTI
UNITED STATES DISTRICT JUDGE

OFFICIAL COURT REPORTER:

Katharine M. Healey, RMR, CRR, FPR-C
PO Box 56814
Jacksonville, FL  32241
(904) 301-6843
katharinehealey@bellsouth.net

(Proceedings reported by stenography;
transcript produced by computer.)

<u>A P P E A R A N C E S</u>

COUNSEL FOR PLAINTIFFS:
**ALAN A. WRIGHT, ESQUIRE**
Devlin Law Firm
1526 Gilpin Avenue
Wilmington, DE 19806
(302) 449-9010
awright@devlinlawfirm.com

**LOUIS D. D'AGOSTINO, ESQUIRE**
**RACHAEL S. LOUKONEN, ESQUIRE**
Cheffy Passidomo, PA
821 Fifth Avenue South, Suite 201
Naples, FL 34102
(239) 261-9300
lddagostino@napleslaw.com
rsloukonen@napleslaw.com

COUNSEL FOR DEFENDANT:
**SRIKANTH K. REDDY, ESQUIRE**
**KATE E. MacLEMAN, ESQUIRE**
Goodwin Procter, LLP
100 Northern Ave
Boston, MA 02210
(617) 570-1465
sreddy@goodwinlaw.com
kmacleman@goodwinlaw.com

**ANDREW ONG, ESQUIRE**
Goodwin Procter, LLP
601 Marshall Street
Redwood City, CA 94063
(650) 752-3100
aong@goodwinlaw.com

**KELLI AYERS EDSON, ESQUIRE**
Quarles & Brady, LLP
101 East Kennedy Boulevard, Suite 3400
Tampa, FL 33602
(813) 387-0300
kelli.edson@quarles.com

ALSO PRESENT:

Marissa Morte, Jill Dumas

P R O C E E D I N G S

September 4, 2024                                    1:35 p.m.

- - -

THE COURT:  Okay.  Good afternoon.

Juan, can you hear me okay?

COURTROOM DEPUTY:  Yep, I can.

THE COURT:  Fantastic.  All rightie.

Ms. Healey, can you hear me okay?

THE REPORTER:  (Indicating.)

THE COURT:  All right.  Of course, as always, let me know if either I or any of the parties are not audible.

THE REPORTER:  Thank you, Your Honor.

THE COURT:  Okay.  Oh, thank you for being here. Thank you.

Okay, then.  Let's take a look at who we have here. All right, then.  Juan, if you would go ahead and call the case.

COURTROOM DEPUTY:  Calling Case No. 2:24-cv-737-JLB-NPM, Gratuity Solutions, LLC, and Gratuity, LLC vs. Toast, Inc.

THE COURT:  Fantastic.  Okay.  So this is not an *ex parte* hearing, as it turns out, given some recent developments on the docket.

Counsel for plaintiffs, please state your appearance.

MR. WRIGHT:  This is Alan Wright from the Devlin Law

Firm representing plaintiff Gratuity.

THE COURT: Good afternoon, Mr. Wright.

MR. WRIGHT: Good afternoon, Your Honor.

THE COURT: Okay. And we do have -- a notice was given out to counsel for the defendant yesterday.

I'll explain kind of which direction we're going given that counsel was just made aware of this hearing and invited to this hearing recently.

But if counsel for defendant could state appearance, I'd appreciate it.

MR. REDDY: Good afternoon, Your Honor. My name is Srikanth Reddy with the Goodwin Procter law firm on behalf of Toast. And with me today is Ms. Kelli Edson, our local counsel. She's having a technical issue with her Zoom, but she's appearing by phone.

And then with me are two of my colleagues, Ms. Kate MacLeman and Mr. Andrew Ong.

And also from Toast we have in-house counsel, Ms. Jillian Dumas and Ms. Marissa Morte.

And I do understand that we may be getting into some information that at least Gratuity has designated as trade secret information. We were hoping that Ms. Dumas and Ms. Morte could be here for as much as possible, but we'll take Your Honor's guidance on that issue.

THE COURT: I understand. I think it's important, to

the best of our ability, to see if my local counsel, Ms. Edson, can try to log in through a different means; although she is showing, at least -- okay.  All right.

THE COURT:  Ms. Edson, can you hear me and see me okay?

MS. EDSON:  (No audible sound.)

THE COURT:  I cannot hear you, but you're not on mute.  So let's try to get your audio working.

MR. D'AGOSTINO:  And Judge Badalamenti, excuse me, I just wanted to introduce ourselves for the record and for this hearing.  We are local counsel for plaintiffs Gratuity Solutions; Lou D'Agostino, and my partner, Rachael Loukonen, with the law firm of Cheffy Passidomo.

THE COURT:  And this is down in Naples, correct?

MR. D'AGOSTINO:  That's correct, sir.

THE COURT:  It's good to see you, Mr. D'Agostino.

MR. D'AGOSTINO:  It's good to see you, Judge Badalamenti.  We've missed you on the appellate courts.  Many years ago.

THE COURT:  And I do recall you.  It's wonderful to see all of you today.

Okay.

MR. D'AGOSTINO:  Thank you, Judge.

THE COURT:  Here's where we are on this.  Ms. Edson, were you able to -- why don't you go ahead and unmute and let me see if I can hear you.

MS. EDSON: (No audible sound.)

THE COURT: I can't hear you. But what you can do is there is a separate phone number. You can stay logged on so I can see you, and then you can use your telephone to log in to the audio there. And it won't impact anything. We just need to have a record in case I have any quest- -- comments to local counsel, I need to have local counsel be able to respond back to me. So we'll wait a moment.

This happens from time to time, unfortunately. But as the pandemic taught us, it saves an awful lot of money for the parties to conduct these types of hearings by Zoom if possible.

So Ms. Edson, when you do get a dial tone in, please go ahead and speak up.

MS. EDSON: Yes, Your Honor. I do have a dial tone.

THE COURT: Fantastic. I can -- I can hear you and I can also see you there.

All right. Now that we've got all this done again, let's go ahead and ask everyone who is not talking to place themselves on mute. When I address a question, just don't forget to take yourself off mute. So that we don't have any background noise.

Okay. I am very familiar with this case. I saw it when it came in and -- as a TRO and was a touch frustrated in that I needed to issue more orders than I would have preferred

to tighten up what's needed for me to go forward on a -- such an extraordinary remedy, which is an *ex parte* temporary restraining order.

The Court does not take motions for injunctive relief, especially those that are deemed as -- to be without the presence of the defendant, lightly. Nor do I suggest that any of the parties here take them lightly either.

Just as an understanding, in the ten years or so that I get these, it's the functional equivalent of me telling me my house is burning down, okay.

So when I get these, I drop everything. I leave the bench. I tell every party in the courtroom to stop doing what they're doing because someone that is a member of my Bar has asked me, in good faith, to put out a fire because they just learned of it. And unless I put it out immediately, it will burn down my house, okay.

I don't think that this is a house-burning situation. I've read it, I've studied it, and it is important, but it's not burning down my house; at least not in my court. It may in other judges's courts somewhere else in the country.

That said, we are outside of *ex parte* now. We are operating outside of a temporary restraining order because now we have counsel present.

I don't expect counsel for the defendant to be prepared to reply in substance today. Although they may have

been made aware of this -- which defeats the whole purpose of it being temporary restraining order *ex parte* -- that this has been filed, I can't expect in due process for them to have a thorough response to what it is, is the relief that's being requested here. That's not, in my judgment, the process that's due.

But while we are here, it is important that I figure out -- or at least it's articulated to me -- the urgency here to get certain things sealed up, what motions are pending, what needs to be decided by me, what could possibly be unopposed, what could possibly be withdrawn, and let's get this case on schedule here.

So I'll ask counsel for plaintiff: What relief -- I've read everything. I have a summary of the relief that's requested, but I need to understand the space-station view looking down onto this planet, what's going on here that is burning my house down?

MR. WRIGHT: Certainly, Your Honor. Can you still hear me?

THE COURT: Absolutely. Thank you, Mr. Wright.

MR. WRIGHT: I seem to have lost everybody on the Zoom. I only see the Zoom at the moment here. But so long as you can hear me -- okay. Now everybody's back.

So as Your Honor is aware from our verified complaint, there was a prior case in Massachusetts, a patent

infringement case with a breach of contract claim. And generally speaking, the patent in issue deals with a system for managing gratuities, or tips, in an industry that has gratuities.

And the general thrust of it, without getting into a whole lot of details of patent law, is that it is a cloud-based system where there is a server remote from various point-of-sale restaurant systems that are clients. It doesn't have to be restaurants; it could be any gratuity-based industry. Hotels, what have you.

During that -- during that case defendants petitioned for an IPR, inter partes review, back at the Patent Office, which was granted in March of this year, and that is pending right now. And the case --

THE COURT: And just to -- you know, I just want to belt-and-suspenders this. This action was in D-Mass federal court?

MR. WRIGHT: That's correct, Your Honor.

THE COURT: Proceed, Counsel.

MR. WRIGHT: So once the case in Massachusetts was stayed and the IPR was going forward, my client, you know, still maintains, monitors, and watches what's going on in the industry. And they began noticing that -- more than just the situation where the system appeared to be infringing. There appeared to be on Toast's website information that is generally

available only to Gratuity's customers once they have created an account, logged on, have a password, and have credentials and agreed to the user agreement not to disseminate or use or release any of the confidential information that they're going to get through the -- what's known as the Pay Portal. It's Gratuity system's Pay Portal, which is where a user goes in, a customer goes in, and actually sets up the interface that is used to coordinate and communicate information between the client and this -- and the server, this gratuity management system, that is -- that is remote.

And --

THE COURT: Is the user agreement within the Pay Portal or before you enter the Pay Portal?

MR. WRIGHT: It's before you enter the Pay Portal. When you fill out an account, you know, you set up your username, you set up a password. There's also second-level authentication through, you know, codes. But you have to agree to this user agreement before you're provided access --

THE COURT: Thank you, thank you.

MR. WRIGHT: And just so you know, in Toast's opposition, I believe it's the Reddy declaration, Exhibit S, you can actually see the -- you can actually see the username and password prompt that you get if you go to Toast's website -- or, excuse me, if you go to Gratuity's website. And if you have that account and you've agreed to the user

agreement, you can then get into the portal. If you don't have an account and you have not agreed under the user agreement, you should not be able to get into the portal. It's confidential.

So during this interim, while the patent case was stayed and as the IPR was going on, my client began to notice that there were strong similarities between some of the graphic user interface and the information in the user interface between the Gratuity portal and what was showing up on the Toast website.

And watching that over the last several months, they've noticed that more and more features that are available in the Gratuity Solutions product were showing up on the public Toast website. And it became a problem. We were made aware of it and we began looking into how to remedy the situation.

And it was, I believe, mid July there was a realization that there was additional material on the Toast website, including a series of how-to videos. And in the words of my client, this wasn't simply how to use the system, but it would be akin to if you bought a computer, it would be telling you how to actually build the computer so that customers and competitors and anybody in the public could go on Toast's website and essentially get the information that was previously confidential through Gratuity's portal.

And so our concern, as you can imagine, is this is

diluting and essentially taking the value of Gratuity's interface in their portal away from them and making it available publicly.

And so every day that the information is up there provided to -- you know, whether it's a customer of Gratuity's that ultimately decides to leave and go do it themselves or go to Toast and use this same information, essentially, it's impacting my client. And it's impacting them in a very severe way because they're losing customers and their value of their product is being diluted in the marketplace.

And that is why we sought a TRO, because as I say, it's an ongoing tort. Every minute that that information is available on Toast's website, it is causing damage, very real damage, in the -- in lost customers, in lost business to Gratuity. And that is why we proceeded with the TRO.

Understood, Your Honor, that this is extraordinary. We did not bring this lightly. And in my client's view, it was burning my client's house down. And so it was an emergency and they did need immediate response to that.

THE COURT: And how long -- and how long has this information been available through Toast's website?

I've reviewed a video that was on YouTube that seems to be up there for quite awhile.

MR. WRIGHT: Well, it's one of these issues where the more you dig, the more you find. And my client did find a lot

of this, you know, within the last several months.

Some of the material does appear to have been up prior to that, but there are many, many pages. And, you know, it's one of those things that it was not discovered until -- until July, mid July, that these -- that these were up there, and it's a problem.

THE COURT: Given the prior case in D-Mass, I mean, why go *ex parte* on this?

MR. WRIGHT: Well, Your Honor --

THE COURT: I just don't understand this.

MR. WRIGHT: It's a different problem. You know, the patent infringement issue --

THE COURT: Yeah, but there's a relationship between -- well, sour relationship between Gratuity and Toast. It would seem to me that you would try to work out whatever this separate problem is on the --

MR. WRIGHT: Well, Your Honor --

THE COURT: So you have the IP matter, certainly, that's out there, and it's being stayed. But we have a matter here where there's a claim that there are trade secrets and the like that are kind of floating out there and being, at least allegedly so, recklessly managed by Toast that's causing financial ruin to your client.

MR. WRIGHT: That's correct.

THE COURT: So you didn't try to work it?

MR. WRIGHT: Well, Your Honor --

THE COURT: Is there anything that can be done here? No communications?

MR. WRIGHT: Well, we've had communications in the past. In fact, prior to the -- prior to the filing of the patent suit, you know, we sent Toast a cease-and-desist letter, said that we've seen -- we believe that Toast's Tips Manager, their commercial product, which competes with my client's, was based on information that Toast had received through a potential acquisition and some NDAs that were put in place at that time.

But there was nothing in that particular, you know, moment in time back with the patent case that gave any indication that actual trade secrets were being taken.

As Your Honor is aware, there are many ways to protect intellectual property. A patent is one, where you disclose to the public, in our situation, a system. You provide information on a system and what it does, how it's configured.

And that case was ongoing. And when we provided, you know, a cease-and-desist letter, a notice letter, prior to that patent suit being filed, we had asked that Toast's Tips Manager be taken down. It was not. The case then went into, you know, a dispute, federal -- the patent action.

Once the case was stayed pending the IPR, there was

some discussion between counsel as to whether or not there was any room for, you know, an agreement to be reached, but it was made pretty clear to us that given the IPR, our negotiating position was pretty weak and that it was not going to be a very favorable situation for us.

So the dispute has continued. It is continuing. The case is pending. The IPR before the Patent Office is continuing and should be wrapped up sometime in early 2025.

But that doesn't change the fact that these trade secrets -- which are really at the heart of my client's business. And the way that they protect themselves is through these trade secrets, of keeping that information confidential so that people can't place it on the internet and competitors can't just pick it up and use it. That's the problem that we're running into.

And given our history, I -- you know, we did not see that that was going to be resolved without seeking some sort of remedy to take this information down off the website. Certainly the how-to videos are very -- you know, very problematic for my client.

And also the other information that we tried to -- we tried to put it in the sealed exhibits, 24. And following the Court's order, we tried to be more particularized in Exhibit 28. But what we tried to do is to show, you know, precisely where the information was in Gratuity's Pay Portal, the

confidential information, the trade secrets that we believe are encompassed by these recipes, is what they essentially are. These are recipes that each customer works out for themselves using -- using this particular interface that Gratuity came up with.

And for that to be placed out in the public, you know, that's like Coca-Cola's secret, Kentucky Fried Chicken's recipe being out on the internet. And it's a real problem that requires taking that information down.

Frankly, I believe my client just did not think that there was going to be any -- it would be futile to try to do that, Your Honor.

THE COURT: Thank you, Counsel.

I previously stated that defense counsel -- first off, I'll note what I hadn't before. Defense counsel has moved in Document Number 35 to file a response to the motion for temporary restraining order. On contemplation of that, I am not expecting defense counsel to be fully prepared on the merits here to discuss the prongs necessary to enter injunctive relief here.

That said, it's obvious that defendant is aware -- or has been aware what's going on. There's been many calls to my chambers and to my clerk's office here. Which, you know, as a rule of thumb, just -- if you want relief, file something. But there is a pending motion here to file a response.

What I think is fair game to ask of the defendants here, or counsel for defendant here, is we have what are allegations here that protected trade secrets are being made available to the public by Toast through its publicly available website, as well as uploads on different host servers that are connected to YouTube and potentially other places.

The allegation is that each day that this has been hanging out there is causing financial harm to the very vitality of plaintiffs' business. The Court's fully aware of it. This is a very common circumstance when we're dealing with trade secrets cases.

Given that there has been a good-faith effort according to the rule, certification of conferring in Document 35 that they -- that defense counsel has discussed with plaintiff, at least to the extent of filing a response, have there been any discussions to perhaps ameliorate the situation by pulling certain things down?

And I'll, you know, ask whoever is best prepared to answer this. If it's Ms. Edson as local counsel, if it's national counsel, whoever had the conversation and conferral and is in the best position to speak for Toast, I'd appreciate any efforts that have been made, if any, be made known to the Court, please.

MR. REDDY: Good afternoon, Your Honor. My name is Srikanth Reddy on behalf of Toast, the defendants.

So, Your Honor, just to clarify things, so docket entry 35 was a motion to seal the opposition brief that was filed concurrently as part of docket entry 35.  There's --

THE COURT:  Yeah, I see that portion of it there, and I'm sorry if I left out that last portion of it.

My point of mentioning it is simply that there's been discussions -- at least there's been some connections here that we're operating outside the paradigm of *ex parte* world, right? That's the whole point of mentioning that, that have -- in conferring as to at least the motion to file a response as to the motion for temporary restraining order under seal by Toast -- that's the way it's titled here in Doc 35 -- have there been any efforts made on the part of Toast to reel back in things that are potentially causing a concern of disrupting intellectual property rights, trade secret rights, that of plaintiff?

MR. REDDY:  There has not been, Your Honor, to answer your question directly.

THE COURT:  Will there be?  Is there a plan for there to be, or we're going to deal with this for three years?

MR. REDDY:  There is not currently a plan to do that, Your Honor.  And if I may, there's some very specific reasons why that is.

THE COURT:  If you are able to give me kind of an idea of what's going on here so I can proceed forth accordingly

to manage the case appropriately.

MR. REDDY: Absolutely, Your Honor. And thank you for the opportunity.

If I may begin, as you'll see in the brief that we filed, we led with personal jurisdiction. So Toast objects to the proceedings that are taking place here on the grounds that the Court lacks personal jurisdiction over it.

If -- but to answer your question, if I may, Your Honor, I can answer your questions directly on the merits after I just note for the record that we object on personal jurisdiction grounds and then I can proceed from there.

THE COURT: Let's assume I have personal jurisdiction. That argument is so weak it's pathetic.

MR. REDDY: Okay.

THE COURT: Let's go ahead and move forward from that. It's a weak argument.

MR. REDDY: Okay, Your Honor.

THE COURT: So let's go on to what the plan is. And personal jurisdiction, I wouldn't hang your hat on it.

MR. REDDY: Okay. Well, thank you, Your Honor.

So first, the other point that we'd want to raise as a jurisdictional matter is that the breach of contract case that's pending in Massachusetts is already dealing with exact -- this exact same issue. The allegations in the complaints are virtually identical, almost verbatim. And the

allegations that -- that Toast somehow misused confidential information and is publishing it are already at issue in the Massachusetts case. That's point number one.

Point number two is that these alleged trade secrets are not trade secrets for numerous reasons, the first of which is that these alleged trade secrets are entirely publicly accessible.

And if I may, Your Honor, Mr. Wright, when he was speaking, he indicated that these screenshots in Exhibit 24, which supposedly show Gratuity trade secrets, are only accessible to people who have log-ins and other information for Gratuity. And that's simply not true. And we're actually prepared to demonstrate that right now if the Court will allow us to do so.

THE COURT: Sure.

MR. REDDY: All right. So if I may, my colleague is going to show Exhibit 24 from the plaintiffs' filings on the screen.

So as -- oh, and I'm sorry, Your Honor, before we do so, our clients are present. And since this information was filed under seal, I'm wondering if it's appropriate for us to excuse them at this time.

THE COURT: Did I see that it was unopposed to file it under seal?

MR. REDDY: It is unopposed, Your Honor.

THE COURT:  Yeah, then they may be excused.

Anything to be stated by plaintiff on this?

MR. WRIGHT:  Yes.  We would agree that it would probably be wise to excuse Toast's in-house counsel.

THE COURT:  Thank you, Mr. Wright.

(Ms. Morte and Ms. Dumas leave the Zoom hearing.)

MR. REDDY:  So this is Exhibit 24.  Again, that was filed with their papers.  And what they've done, as Your Honor is familiar with the record, they've identified various Feature Functionalities that they contend are trade secrets.  So they try to show how Toast is somehow misusing or appropriating those trade secrets.

On the left are excerpts from Gratuity Solutions's PayDayPortal product, and you see that they have a description about what they contend is trade secret and then a screenshot showing what they believe is the trade secret information.

Now, underneath that screenshot is a website.  And if we click on the website, we see the exact information that Gratuity says is its trade secrets.

I do not have access to the Gratuity portal.  I am not an authorized user.  No one at my law firm is to my knowledge.

And if we -- and this was just one example on Exhibit 24.  We've checked.  If you click every single one of those links on Exhibit 24, you will be able to see the alleged

trade secret information. Anyone in the world can. And this has been the case since -- we've only had access to this document since Sunday. But every single one of these URLs supposedly showing trade secrets is completely publicly accessible.

Now, the second way we want to show that there's no trade secrets here is that --

THE COURT: All right. So the argument is that the plaintiff itself is making this information available publicly?

MR. REDDY: That's correct, Your Honor. And not just now, but they've been doing it for ten years, because these same features were disclosed in its patent application that was published in 2014.

And again, Your Honor, if I may, I'm prepared to demonstrate how that happened.

THE COURT: I'm going to put a pin in that for now, Mr. Reddy.

MR. REDDY: All right. Thank you, Your Honor.

THE COURT: Mr. Wright, help me understand.

MR. WRIGHT: Certainly, Your Honor.

THE COURT: Are the items that are posted currently -- at least -- this is just a small sample, I understand that -- that is being made available through a publicly available portion of your client's website, are those the trade secrets that are -- are those some or all or none of

the trade secrets that we are referring to in the motion before the Court?

MR. WRIGHT: Your Honor, the information in Exhibit 24 includes our trade secrets. I'm not sure how access was gained.

The statement that these are publicly available, that's not my understanding from my client. That's not my understanding from my trying to click on those items. I don't know how they set up this particular demonstration to you.

THE COURT: So would you be surprised if I typed that in and it came up on my computer?

MR. WRIGHT: Yes, I would, Your Honor. And from my client's standpoint, this information should only be available to those that have signed up for an account and have agreed to the user agreement with Gratuity Solutions.

And if it is available publicly, that's not information that my client was aware of. In their mind, this is confidential information, trade secret information that needs to be protected.

MR. REDDY: Your Honor, my colleague has posted the link in the chat if you'd like to --

THE COURT: Mr. Wright, in the Zoom discussion link is what I manually typed in, and it shows up in a second window on my highly-restricted-access court account, which has a lot of firewalls. This is kind of concerning to me.

MR. WRIGHT: Concerning to me as well, Your Honor.

THE COURT: This -- so I -- I -- I don't understand.

Is there a different link that could be sent to me, Mr. Reddy, as to, perhaps, a different purported trade secret that's set forth as under seal?

MR. REDDY: Absolutely, Your Honor. So Exhibit --

THE COURT: If that could be sent by whomever into the -- this chat, I would genuinely appreciate it.

MR. REDDY: Absolutely, Your Honor.

THE COURT: And I don't want any more than one more, please.

MR. REDDY: And thank you, Your Honor.

And just to be clear, if Your Honor were to open Exhibit 24 from plaintiffs' filings, you would have access to every single one of those, but --

THE COURT: Yeah, I have seen them. But I would like to just be -- it be part of my record here.

MR. REDDY: Thank you, Your Honor.

And then, Your Honor, there was one other point I wanted to make regarding the urgency issue that the Court had raised.

So Mr. Wright stated that Gratuity only recently became aware of certain information. We produced these websites to them in October of 2023. They were produced with no confidentiality designation, and a month later they cited

these websites in their infringement contentions against us in the Massachusetts case.

The notion that they just became aware of these in July of this year is directly contradicted by the documentary evidence. We gave them to them. They cited them back to us. And a summary of those is set forth in an exhibit to my declaration that was filed yesterday. Every single one of those alleged trade secrets we have matched to a website that we gave them almost a year ago.

THE COURT: Mr. Reddy --

MR. REDDY: And that would have been the time to amend the pleadings in Massachusetts. If they wanted to bring a trade secret case, they had the right to do so as of --

THE COURT: Mr. Wright, was your firm counsel to the action in D-Mass?

MR. WRIGHT: Yes, it was, Your Honor.

THE COURT: Do you wish to maintain your motion for temporary restraining order at this time?

MR. WRIGHT: Your Honor, I would like to talk to my client about this and try to determine what exactly the issue is and how that information is available publicly, because my understanding from my client is that there's just no way that that should happen and that this is --

THE COURT: So I'm referring to the exhibit under seal. I've just opened three more.

We're done here. The motion for temporary restraining order is denied. This is absurd and insulting to the Court.

I will deny it without prejudice, Mr. Wright. And the reason why I'm denying it without prejudice, to give every effort to the plaintiff to remove what is publicly available to the Court and to this public proceeding today and to edit it carefully.

If there are other portions of -- pieces of information that are trade secrets that are identified in your motion for injunctive relief, absolutely. The Court shall provide leave for the plaintiff to file those. Absolutely.

MR. WRIGHT: Thank you, Your Honor.

THE COURT: Listen, I've been there as counsel. You know what your client tells you. You have to rely on representations of your client. This happens all the time. I'm not -- I'm not shooting an arrow at you, Mr. Wright.

MR. WRIGHT: Understood, Your Honor.

THE COURT: You know, just please know, I've been there, trust me. More than once and more than a thousand times.

MR. WRIGHT: Understood, Your Honor.

THE COURT: So let's clean this up here a little bit and let's figure out where we are here, okay.

And next, also -- you know, this is no longer

*ex parte.* The proper motion would be for preliminary injunction. And we're going to, you know, lay forth some ground rules here so that I could determine, you know, how to prioritize this in a case where I -- a situation where I have 440 other civil matters. I want to give every minute of my time to every emergency. And I do. But I'm trying to figure this out here.

When I watched the YouTube video last week or the week before, whenever it -- the TRO first came in, I didn't see anything in there that seemed particularly probing as to trade secrets. You know, it's obvious that she was -- I forgot what her name was. It started with a Z.

MR. WRIGHT: Ms. Zarembka.

THE COURT: She was very comfortable discussing it in a collegial sort of way with the host of the Toast, as I -- host of the Toast podcast. But I didn't see it to be what I would normally understand to be trade secrets. And it's been uploaded there quite awhile.

With that said, let's go ahead and clean up this docket here. And I again stress, you could file a motion for preliminary injunction with -- I am giving you leave to do that, but please bear in mind just a few things.

First rule, Middle District of Florida: Confer. Go through and say, "Okay. Here are the things that are out in the public domain that have been misappropriated by your

client," and talk to counsel for Toast. "These are the things that are out there. We believe these to be secret. Will you take them down?"

Before you do that, if they say "pound sand," then you have a record of "pound sand" and you could represent to me: Pound sand. That means I have to -- then I'll exercise my Article III and statutory authority accordingly.

Okay. I'm going to enter a series of endorsed orders that are going to be entered directly from my chambers. I will draft them as soon as I am through with this hearing and we will enter them directly from my chambers.

First thing I'm going to do is deny Doc 20, the *ex parte* motion for temporary restraining order and *ex parte* order of seizure of property. It's denied without prejudice in light of information that has been identified as trade secrets by definition are not a secret if the plaintiffs themselves are publicizing it. It's just a banal principle. So that's denied. We will enter that without prejudice.

The Court will also order that it shall not be *ex parte,* for obvious reasons. It's no longer *ex parte*, all right. So the proper vehicle shall be requested under the rules and it'd be preliminary injunction. And that will only be filed after plaintiff confers with counsel for the defendant as to what is purportedly a secret. If this happens again, this is not good.

Next, the emergency motion for case management conference by Toast is denied without prejudice, Document Number 28. Why? Because invariably we're going to need a second amended complaint here. It's not complicated.

Defendant's motion to file a response to motion for temporary restraining order under seal is denied as moot in light of the ruling of the Court of -- when a motion is properly served upon -- if it's needed, even -- for preliminary injunction, we -- a response, of course, would be permitted before we have an evidentiary hearing, if necessary.

All right. Counsel for plaintiff, Mr. Wright, before -- my magistrate judge permitted a response, or directed a response to the motion by plaintiff to file under seal. That's all -- that's all prompted by the operative verified first amended complaint here.

I'm not going to dismiss it without -- here without at least sounding that out with you. It would seem to me that given what's gone on here, an amended complaint probably should be filed. Do you have any position on this? Because I don't want defendant to rack up time in the case if they're responding to something that goes under seal for a -- what will not be an operative complaint here.

MR. WRIGHT: Understood, Your Honor. I would like some time to explore what's transpired here today with my client and try to determine what exactly the -- why the

confidentiality was not as they thought. And --

THE COURT: I understand, Counsel. And that's why I didn't just do it.

MR. WRIGHT: Sure, absolutely. Appreciate it.

THE COURT: But I at least wanted to throw it out there so that you can have a productive conversation with your client in light of this.

But, you know, for the record, I've opened up five links already. So it may well be that they pull them down after this. Oh, by the way, that doesn't make it secret.

MR. WRIGHT: Understood, Your Honor.

THE COURT: Yeah, and I would be quite aggravated if these links reappeared. I don't know that there would be a federal judge in the United States that would --

MR. REDDY: Your Honor, if I may just speak to that for a moment.

THE COURT: -- do that -- Counsel, I'm not ready. If you could just allow me to conclude here, Mr. Reddy.

The other thing is I will provide plaintiff seven days -- confer with your client; this is fair. And moreover, within that time period, should there be a decision to move forth on this case, consider the argument that has been made in the briefing here as well as just the bid by Mr. Reddy as to the interaction between what is being asserted in this case and that of which had been asserted in D-Mass.

I have not reviewed the litigation in D-Mass. I am not the least bit suggesting that I agree with Mr. Reddy. I do ask for a juxtaposition of such with your client, because I'll be asking for that to be filed in my -- at some point, and then I'll be doing the juxtaposition.

Just as a matter of course, district judges around the country don't like to steal from another judge's plate. We try to keep it so that there's kind of one decision-maker and we don't unintentionally wallop a colleague on the bench throughout the country. And we do yield to the first-filed ruled; you know, we do. It's just appropriate in the administration of justice as well as for efficiency of a generally overburdened federal bench.

Okay. All right. Mr. Reddy, do you have anything else to say in light of the oral orders that I have set forth? Which I will be entering directly from chambers before the close of business today, as soon as I am completed with this hearing.

MR. REDDY: Two points I was hoping to raise, Your Honor.

The first is, you know, we talked a lot about Exhibit 24 and the links to Exhibit 24. Our view, that's just the tip of the iceberg of the disclosure. Those are marketing materials that Gratuity sends and makes available to anybody who's interested in their product.

And this is just the -- deleting those links to Exhibit 24 is not going to solve this issue.  In fact, their patent disclosure, again, we matched up every single trade secret to the patent disclosure.  That's ten years ago. There's that point.

And then I guess the second issue is that if they do decide to move forward with a preliminary injunction, would we then have a status conference to discuss a briefing schedule for the -- you know, for instance, taking depositions of any declarants and, you know, the ability to have experts and things like that?

THE COURT:  I generally just issue it.  I don't know what there is to discuss.  I issue it and make a decision.  And if there's a problem, I then will ask the parties to confer with each other and come up with an amicable solution to whatever the problem is.

Like I said, it's tough to hold hearings on what I consider to be normal scheduling issues.  So -- but if there's a problem, you bring it up after conferring with each other.

MR. REDDY:  Okay.  So just to be clear, we will wait to hear from you on a briefing schedule if they do file a preliminary injunction motion?

THE COURT:  Yeah.  It's not just going to hang out there.

MR. REDDY:  Understood.  Thank you.

THE COURT: We're pretty competent. And that goes part and parcel -- you know, I'll say it again, I wrote it in an endorsed order, which I rarely do: Don't just keep calling chambers, guys. This is crazy.

I'm perfectly aware what's going on here. And I can't divulge -- even the stuff that was considered procedural by counsel, it was not procedural. It also makes a burden on my clerk's office. Each courtroom deputy I have is doing a thousand cases.

Anyway, if there are other documents that pass outside of Exhibit 24 that are also public, counsel for plaintiff is well aware that he's going to be conferring with counsel for Toast as to all of them. That was inferred.

I'm not the lawyer here. Mr. Wright's a seasoned litigator. He certainly would know not to file that again and have to face me or the Eleventh Circuit on this.

So most certainly if something was given 10 years ago or 15 minutes ago, most certainly Mr. Wright needs the opportunity of knowing such so that he can go back to his client and say, "I'm an officer of the Court. I cannot file this. The judge was more than gracious here by doing this without prejudice. I have the discretion to prevent this. And I will not do such," because I've been there.

But you get one Mulligan here, guys. So -- but we have to move forward.

Mr. Wright, do you have any questions before we conclude this hearing?

MR. WRIGHT: No, Your Honor. I appreciate your time and apologize again for this situation. I will look into it and we'll make sure we deal with it appropriately.

THE COURT: Right. And, you know, the overarching matter is, and I referenced it here, where does this relate to D-Mass?

MR. WRIGHT: Absolutely.

THE COURT: And I don't want -- because I -- if that -- that is an overarching thing. Although I have personal jurisdiction, the first-filed rule is something I really do take strongly into consideration whether or not we're in the right forum here.

MR. WRIGHT: Your Honor, I'm sorry, I would just say for the record that we believe that this is a separate matter, separate cause of action, of course, based on trade secret versus information that's publicly available. We're going to look into that. But, you know, if the trade secrets are there, I think we'd be able to explain to you the difference between trade secrets and why it's not stepping on the toes of the patent case. It's not the same nucleus of operative facts.

But we will address that when we get to it, if we get to it.

THE COURT: Thank you, Mr. Wright.

And is there anything else, Mr. Reddy, that you would have before we conclude this hearing?

MR. REDDY: Not from Toast, Your Honor. Thank you.

THE COURT: I appreciate both counsel for being here today. And I am on this case. It is -- it shows up in my in-box with morning coffee. We're on it, as we are on other cases that have been marked as urgent by officers of the court, and as we are in all cases.

That said, I appreciate the diligence on the part of clients [verbatim] and being sure that their clients's interests are being represented to the best of their ability.

And I'm hopeful that some of this, if not all of this, can be ferreted out with conversations with clients, and then conversations between attorneys, which may then, in turn, result in additional conversations with clients.

If within seven days from now, Mr. Wright, you are still in those conversations, simply ask the Court for the Court -- the Court notes that -- requests that the current verified complaint remain pending as counsel for plaintiff is working toward -- working with client to decide -- client and defendant to decide whether to move forward with this complaint. That's it. And we -- I will rule on it very quickly so that you can take a deep breath.

But I don't want my one-week concept to turn into a curtailing of due diligence to decide whether or not to proceed

forth. That's not in the Court's best interest, to bring forth things that have not been sounded out properly between counsel on both sides as well as their respective clients.

All right, then. Thank you very much. We'll be entering those orders by day's end. And I wish everyone a peaceful and safe remainder of the afternoon.

The Court shall remain in recess.

MR. WRIGHT: Thank you, Your Honor.

MR. REDDY: Thank you.

(The proceedings concluded at 2:29 p.m.)

- - -

CERTIFICATE OF OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT)

MIDDLE DISTRICT OF FLORIDA )

I hereby certify that the foregoing transcript is a true and correct computer-aided transcription of my stenotype notes taken at the time and place indicated herein.

DATED this 5th day of September, 2024.

/s/ Katharine M. Healey
Katharine M. Healey, RMR, CRR, FPR-C
Official Court Reporter